# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE WAL-MART STORES, INC. DELAWARE DERIVATIVE LITIGATION | CONSOLIDATED C.A. No. 7455-CB |

## MEMORANDUM OPINION

Date Submitted: February 3, 2016
Date Decided: May 13, 2016

Stuart M. Grant, Michael J. Barry and Nathan A. Cook, GRANT & EISENHOFER P.A., Wilmington, Delaware; Christine S. Azar and Ryan T. Keating, LABATON SUCHAROW LLP, Wilmington, Delaware; Daniel Girard, Amanda Steiner, Dena Sharp and Adam Polk, GIRARD GIBBS LLP, San Francisco, California; Thomas A. Dubbs, Louis Gottlieb and Jeffrey A. Dubbin, LABATON SUCHAROW LLP, New York, New York; Frederic S. Fox, Hae Sung Nam, Donald R. Hall and Jeffrey P. Campisi, KAPLAN FOX & KILSHEIMER LLP, New York, New York; *Co-Lead Attorneys for Co-Lead Plaintiffs California State Teachers' Retirement System, New York City Employees' Retirement System, New York City Police Pension Fund, Police Officers' Variable Supplements Fund, Police Supervisor Officers' Variable Supplements Fund, New York City Fire Department Pension Fund, Fire Fighters' Variable Supplements Fund, Fire Officers' Variable Supplements Fund, Board of Education Retirement System of The City of New York, Teachers' Retirement System of The City of New York, New York City Teachers' Variable Annuity Program, and Indiana Electrical Workers Pension Trust Fund IBEW.*

Donald J. Wolfe, Jr., Stephen C. Norman and Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Theodore J. Boutrous, Jr., George H. Brown, Joshua S. Lipshutz and Alexander K. Mircheff, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; Jonathan C. Dickey and Brian M. Lutz, GIBSON, DUNN & CRUTCHER LLP, New York, New York; Mark A. Perry, GIBSON, DUNN & CRUTCHER LLP, Washington, District of Columbia; *Attorneys for Nominal Defendant Wal-Mart Stores, Inc. and Defendants Aida M. Alvarez, James I. Cash, Roger C. Corbett, Douglas N. Daft, Michael T. Duke, Gregory B. Penner, Steven S. Reinemund, Jim C. Walton, S. Robson Walton,*

*Linda S. Wolf, H. Lee Scott, Jr., Christopher J. Williams, James W. Breyer, M. Michele Burns, David D. Glass, Roland A. Hernandez, John D. Opie, J. Paul Reason, Arne M. Sorenson, Jose H. Villarreal, Eduardo Castro-Wright, Thomas A. Hyde, Thomas A. Mars, John B. Menzer and Lee Stucky.*

**BOUCHARD, C.**

In April 2012, the *New York Times* published an exposé describing the cover-up of an alleged bribery scheme at Wal-Mart de Mexico ("WalMex"), a subsidiary of Wal-Mart Stores, Inc. ("Wal-Mart"). On the heels of this article, Wal-Mart stockholders filed fifteen lawsuits in Arkansas and Delaware asserting derivative claims on behalf of Wal-Mart.

One of the stockholders in Delaware demanded access to Wal-Mart's books and records under Section 220 of the Delaware General Corporation Law in an effort to bolster its case. The Delaware actions were consolidated, and the Delaware plaintiffs vigorously pursued the books-and-records litigation, which took three years to resolve, including an appeal to the Delaware Supreme Court. In May 2015, the Delaware plaintiffs filed an amended derivative complaint with information obtained from Wal-Mart's records.

The Arkansas plaintiffs neither sought Wal-Mart's records nor waited for the outcome of the Section 220 case in Delaware. They instead proceeded with their case, which defendants moved to dismiss. In March 2015, before plaintiffs in Delaware had completed the Section 220 litigation and filed their amended complaint, the district court in Arkansas granted defendants' motion to dismiss. It concluded that the Arkansas complaint failed to adequately allege demand futility. Defendants now move to dismiss this action, arguing that issue preclusion prevents the plaintiffs here from re-litigating demand futility.

1

Subject to Constitutional standards of due process, Arkansas law governs the question of issue preclusion in this case. The basic test for issue preclusion under Arkansas law is easily satisfied here. But Arkansas courts have not addressed issue preclusion in the context of stockholder derivative suits. That context requires one to determine whether two different stockholder plaintiffs asserting derivative claims on behalf of the same corporation in separate cases are in privity. Thus, this case presents the challenge of having a Delaware trial court predict how a court in Arkansas likely would resolve an open question of Arkansas law. I conclude, consistent with the clear weight of authority from other jurisdictions, that an Arkansas court likely would find privity in this situation.

Another challenge of this case is determining whether an Arkansas court would deem a stockholder plaintiff who fails to pursue books and records before launching a derivative lawsuit to be an adequate representative of the corporation. On that question, I conclude, consistent with Delaware Supreme Court authority, that an Arkansas court would not presume inadequacy from failing to pursue books and records but would conduct a case-specific inquiry of the issue with principles of due process in mind and, based on the particular circumstances of this case, would find the Arkansas plaintiffs to be adequate representatives.

For these and other reasons explained below, the plaintiffs in this case are barred from re-litigating demand futility and their complaint must be dismissed.

## I.    BACKGROUND

Unless noted otherwise, the facts recited in this opinion are based on the allegations of the Verified Consolidated Amended Stockholder Derivative Complaint filed on May 1, 2015 (the "Delaware Complaint"). Although most of these facts are not directly relevant to the analysis of issue preclusion, they are included to provide the context.

### A.    The Parties

Nominal defendant Wal-Mart Stores, Inc. is a Delaware corporation with headquarters in Arkansas that operates retail stores in the United States and internationally. The company is publicly traded on the New York Stock Exchange. The Walton family, which founded Wal-Mart, controls 49.95% of its voting shares through Walton Enterprises LLC. Co-lead plaintiffs are various pension funds that have been Wal-Mart stockholders at all times relevant to this action.

Defendants Aida M. Alvarez, James W. Breyer, M. Michele Burns, James I. Cash, Roger C. Corbett, Douglas N. Daft, Michael T. Duke, Gregory B. Penner, Steven S. Reinemund, H. Lee Scott, Jr., Arne M. Sorenson, Jim C. Walton, S. Robson Walton, Christopher J. Williams, and Linda S. Wolf were the fifteen members of Wal-Mart's board of directors when the original complaints in

Arkansas and Delaware were filed in 2012 (the "Demand Board").[1] They joined Wal-Mart's board at various times between 1978 and 2010. Plaintiffs allege that twelve of them were on the board during some part of the alleged bribery or cover-up conduct. In addition to being a director, Duke served as Wal-Mart's Chief Executive Officer from 2009 to 2014.

Defendants David D. Glass, Roland A. Hernandez, John D. Opie, J. Paul Reason, and Jose H. Villarreal were directors during the time of some of the alleged misconduct but were not on the Demand Board because they had ceased serving as directors by the time the original complaints in the Arkansas and Delaware actions were filed. Defendants José Luis Rodriguezmacedo Rivera, Eduardo Castro-Wright, Thomas A. Hyde, Thomas A. Mars, John B. Menzer, Eduardo F. Solórzano Morales, and Lee Stucky are former executives of Wal-Mart or WalMex.

### B. The Alleged WalMex Bribery Scheme and Investigation

In the late 1990s and early 2000s, Wal-Mart sought to expand internationally to continue growing despite saturation in the United States. Its subsidiary in Mexico, WalMex, was an important part of that growth. By 2004, WalMex operated 49.6% of Wal-Mart's international discount stores, 32.3% of its

---

[1] Plaintiffs assert that the relevant board for assessing demand futility should be the board when the original Delaware complaints were filed. Compl. ¶ 209. Defendants do not argue otherwise.

international Supercenters, and 66% of its international Sam's Clubs. WalMex is Wal-Mart's largest foreign subsidiary.

According to the Delaware Complaint, WalMex achieved its rapid expansion by bribing government officials in Mexico. This bribery escalated dramatically in 2003 when Castro-Wright became Chief Executive Officer of WalMex. Castro-Wright authorized bribes to quickly secure construction permits, zoning approvals, and licenses with the goal of rapidly expanding WalMex's operations before competitors had time to react.

A highly publicized example of this scheme was the use of more than $200,000 in bribes to secure multiple permits that allowed WalMex to build a store in Teotihuacán adjacent to an ancient temple and Mayan pyramids. During construction, it was discovered that not only was the store adjacent to these historic sites, but it was being built atop other ancient ruins as well. This revelation sparked protests, accusations of bribery and corruption, and international media attention, including a *New York Times* article published on September 28, 2004.

Between 1998 and 2005, Wal-Mart did not undertake a full audit of WalMex, which enabled its officials to use bribery without interference or inquiry from management in the United States. In late 2003 and early 2004, Wal-Mart created a Corporate Responsibility Department and a Compliance Oversight Committee to oversee international compliance issues and to detect and prevent

5

violations of law. The Compliance Oversight Committee, which consisted of officers from various departments, was charged with reporting compliance issues to the audit committee of Wal-Mart's board.

In early 2004, drafts of new anti-corruption policies were circulating within Wal-Mart, eventually reaching WalMex and its management, including Castro-Wright. Shortly thereafter, WalMex began an internal investigation of Sergio Cicero Zapata, an in-house attorney in WalMex's Real Estate Department. WalMex investigated payments made to two law firms Cicero used as a means to make payments to outside agents known as "gestores" for "gestoria" services. Plaintiffs allege that these payments constituted bribes to government officials to help WalMex circumvent laws and regulations.[2]

WalMex also retained an outside investigation firm (Kroll, Inc.) to determine whether Cicero had personally benefited from his relationship with the gestores and whether he had potentially defrauded WalMex. Kroll concluded that he had not, but it discovered that Cicero's wife worked for one of the law firms providing gestoria services. After these investigations, WalMex terminated Cicero's employment, informing him that his position had been eliminated due to a

---

[2] Compl. ¶¶ 54, 71. Wal-Mart contends that such payments can be valid and not violate the Foreign Corrupt Practices Act of 1977. Tr. Oral Arg. 121-22; Defs.' Supp. Br. 12; Defs.' Further Supp. Response 3-4 (arguing that "facilitating payments" is a term of art referring to a valid and legal payment practice).

restructuring. WalMex did not tell him that he had been the subject of an outside investigation or that management had found out about his wife's employment.

By mid-2004, Wal-Mart's board and audit committee had formally adopted anti-corruption policies prohibiting employees from offering anything of value to government officials on behalf of Wal-Mart. In August 2004, Rodriguezmacedo (WalMex's general counsel) and Castro-Wright contacted Maritza Munich, General Counsel for the Wal-Mart International business segment, about Cicero's possible wrongdoing. They informed Munich that Cicero may have used questionable methods for obtaining licenses and permits and provided her with the results of the Kroll investigation and of an internal 2004 audit, which showed that millions of dollars in illegal payments had been made to the two law firms, which were not on WalMex's list of authorized firms. Because Munich was a member of the Compliance Oversight Committee, plaintiffs infer that Munich must have reported this information to the board's audit committee and that the audit committee would have discussed it with the full Wal-Mart board.

In late 2004, WalMex's internal audit department drafted a report showing that WalMex had expenses in the form of contributions to government entities and payments to outside agents to expedite government paperwork. Certain Wal-Mart managers, including Munich, received this report. Plaintiffs infer that management would have raised this issue with the Compliance Oversight Committee and that

7

the board's audit committee and the full board would have discussed these issues at a meeting in March 2005.

In September 2005, Munich heard from Cicero, who had not been employed at WalMex since sometime around March 2004. Cicero informed Munich that he had information regarding payments WalMex made to complete 300 projects, including the store in Teotihuacán. Munich shared this communication with Mars, Wal-Mart's general counsel. Plaintiffs infer that Mars and other members of management discussed Cicero's allegations of bribery at an audit committee meeting, and that the audit committee reported the allegations to the full board.

In October 2005, Munich hired an attorney in Mexico City to interview Cicero. During multiple interviews, Cicero explained WalMex's practice of bribing officials to remove regulatory obstacles and WalMex's use of gestores to carry out the plan. Cicero provided examples of bribes and noted that he had several binders of documents relating to WalMex's bribery of public officials. Munich provided Mars and Hyde, Wal-Mart's corporate secretary, with copies of the interview summaries. Mars forwarded this information to Duke and Stucky, among others. In mid-October, Munich and Mars retained Willkie Farr & Gallagher LLP to represent Wal-Mart in connection with the matter.

On November 2, 2005, Willkie Farr recommended that Wal-Mart undertake a thorough external investigation of Cicero's bribery allegations. Wal-Mart opted

8

instead for a less extensive in-house investigation led by the Corporate Investigations Department. Plaintiffs allege that this decision reflects the beginning of a corporate cover-up of the WalMex bribery scheme, noting that Wal-Mart's in-house teams were ill-equipped for the task and were vulnerable to interference from management. Wal-Mart carried out its investigation during November 2005, and the investigators expressed concern over their preliminary findings. On November 18, Munich, Mars, Stucky, and others discussed the results of the investigators' preliminary inquiry, including a number of "facilitating" payments to clear regulatory hurdles and expedite construction of stores. Plaintiffs infer that this information was shared with the audit committee and the Wal-Mart board.

On December 2, 2005, after reviewing the preliminary results with others, Stucky and Mars decided that WalMex would handle the next phase of the investigation, a decision that plaintiffs infer was made with the consent of Hernandez and the other members of the audit committee. Soon after, the Corporate Investigations Department and Internal Audit Services issued separate reports summarizing the evidence surrounding Cicero's bribery allegations. The Corporate Investigations report stated that "there is reasonable suspicion to believe that Mexican and USA laws may have been violated" and recommended further

investigation relating to payments for gestoria services to the two unauthorized law firms.

In mid-December 2005, Mars and Stucky carried out their decision to have WalMex handle the investigation by tasking Rodriguezmacedo and other WalMex officials with a follow-up investigation to complete the inquiry. Shortly thereafter, Rodriguezmacedo and WalMex management responded that they had found information supporting the hypothesis that Cicero was attempting to benefit personally from the transactions at issue. Plaintiffs allege that transferring the investigation to WalMex reflects a decision to cover up the bribery scheme. Shortly before quitting her job at Wal-Mart, Munich expressed concerns over the decision to assign the investigation to WalMex, since WalMex and its employees were the subject of the investigation.

On December 20, 2005, Internal Audit Services issued its final report, which concluded that WalMex had provided payments through gestores to government agencies to expedite licenses and permits, and that WalMex senior management was aware of this practice and had used secret accounting codes to obscure it. The report recommended further investigation.

Beginning in February 2006, Rodriguezmacedo took full charge of the WalMex follow-up investigation. In March 2006, he issued a report concluding that no evidence substantiated the existence of unlawful payments to government

10

authorities. To the contrary, according to the report, Cicero had defrauded WalMex by making payments to gestores for services never rendered. Rodriguezmacedo's conclusions were largely based on WalMex management's denial that any bribery had taken place. Wal-Mart and WalMex management agreed that a successful legal or financial pursuit of Cicero was unlikely.

In May 2006, with Rodriguezmacedo's final report in hand, Wal-Mart management considered the investigation closed. Plaintiffs infer that the audit committee and the board also reviewed the final report in May and allege that the board should have known the report was unreliable because of Rodriguezmacedo's potential involvement in the alleged bribery scheme and the conclusions the report reached, which were at odds with previous investigations.

The *New York Times* undertook its own investigation of Wal-Mart's response to Cicero's allegations of bribery. In late 2011, Wal-Mart found out about the *New York Times* investigation and alerted the United States Department of Justice and the United States Securities and Exchange Commission that Wal-Mart had begun to investigate possible violations of the Foreign Corrupt Practices Act of 1977 ("FCPA"). In response to reporting by the *New York Times*, Wal-Mart denied that any executives knew about alleged corruption in the company. In May 2012, Wal-Mart reported that its internal investigation would extend beyond

11

WalMex and include potential FCPA violations in other jurisdictions, including Brazil, China, and India.

Plaintiffs allege that Wal-Mart incurred over $500 million in expenses in connection with its FCPA investigations and compliance reviews, and may face significant additional costs if it is fined for FCPA violations.

## C.     The Arkansas Litigation

On April 21, 2012, the *New York Times* published an article detailing the alleged WalMex bribery scheme and cover-up.[3]  Shortly after the article went to press, Wal-Mart stockholders filed numerous derivative suits in Delaware and Arkansas.

The United States District Court for the Western District of Arkansas consolidated the federal actions in Arkansas, and the Arkansas plaintiffs filed a consolidated complaint on May 31, 2012 (the "Arkansas Complaint").[4]  The Arkansas Complaint asserted claims against Wal-Mart's directors and executives for breach of fiduciary duty primarily based on intentional wrongdoing as well as a secondary *Caremark* theory for allowing Wal-Mart to violate laws, for violations

---

[3] *See* David Barstow, *Vast Mexico Bribery Case Hushed Up by Wal-Mart After Top-Level Struggle*, N.Y. Times (Apr. 21, 2012), http://www.nytimes.com/2012/04/22/business/at-wal-mart-in-mexico-a-bribe-inquiry-silenced.html.

[4] Consolidated Verified Shareholder Derivative Complaint, *In re Wal-Mart Stores, Inc. S'holder Deriv. Litig.*, C.A. No. 4:12-CV-4041-SOH (W.D. Ark. May 31, 2012).

of Sections 14(a) and 29(b) of the Securities Exchange Act of 1934, and for contribution and indemnity.[5] The Arkansas plaintiffs challenge the same misconduct regarding the bribery scheme at WalMex and the efforts to cover it up that the Delaware plaintiffs challenge in this case.[6]

On July 6, 2012, defendants in the Arkansas action moved to stay the litigation pending resolution of the proceedings in this Court. On November 20, 2012, the district court granted the stay.[7] On December 18, 2013, however, the Eighth Circuit vacated the stay order in light of the Section 14(a) claim that was present in the Arkansas action but not in the Delaware litigation, and remanded the case to the district court, stating that the district court "may impose a more finite and less comprehensive stay."[8]

On January 10, 2014, defendants in the Arkansas action moved for a more limited stay pending this Court's decision on demand futility but not its resolution of the entire action. In June 2014, the district court denied the motion. In doing

---

[5] Arkansas Complaint ¶¶ 282-300; *see also In re Wal-Mart Stores, Inc. S'holder Deriv. Litig.*, 4:12-CV-4041, at 16 (W.D. Ark. Apr. 3, 2015) (ORDER) (noting plaintiffs' argument that they pled *Caremark* theory in the alternative to theory of intentional wrongdoing).

[6] Arkansas Complaint ¶¶ 77-192.

[7] *In re Wal-Mart Stores, Inc. S'holder Deriv. Litig.*, 2012 WL 5935340, at *1 (W.D. Ark. Nov. 27, 2012) (ORDER) (revising initial order of Nov. 20, 2012), *vacated and remanded sub nom. Cottrell v. Duke*, 737 F.3d 1238 (8th Cir. 2013).

[8] *Cottrell v. Duke*, 737 F.3d at 1247-49.

13

so, the district court noted that "it is likely that the first decision on demand futility will be entitled to collateral estoppel effect" and that if the district court "decides the issue first, then the issue will not have to be relitigated in Delaware state court."[9]

Defendants moved to dismiss the Arkansas Complaint under Federal Rule of Civil Procedure 23.1 for failing to adequately allege demand futility. On March 31, 2015, the district court granted their motion.[10] The district court applied Delaware law to the substantive aspects of the demand requirement and assessed whether to apply the *Aronson*[11] test or the *Rales*[12] test to determine demand futility. The court noted that there is only a blurry distinction between *Aronson* and *Rales*, but determined that *Rales* must apply because the complaint lacked "any particularized facts that link a majority of the Director Defendants to any actual decision,"[13] as would be required for *Aronson* to apply.

---

[9] *In re Wal-Mart Stores, Inc. S'holder Deriv. Litig.*, C.A. No. 4:12-CV-4041, at 3-4 (W.D. Ark. June 4, 2014) (ORDER).

[10] *In re Wal-Mart Stores, Inc. S'holder Deriv. Litig.*, 2015 WL 1470184, at *1 (W.D. Ark. Mar. 31, 2015) (ORDER). The order was amended to correct typographical errors on April 3, 2015. *See* Leavengood Aff. Ex. 6, *In re Wal-Mart Stores, Inc. S'holder Deriv. Litig.*, 4:12-CV-4041 (W.D. Ark. Apr. 3, 2015) (the "Arkansas Order"). The remainder of this opinion cites the amended version.

[11] *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984).

[12] *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).

[13] Arkansas Order at 11 & n.6.

14

Applying *Rales*, the district court determined that the Arkansas Complaint failed to suggest any particularized basis to infer that a majority of Wal-Mart's fifteen-member board (as defined above, the Demand Board) had actual or constructive knowledge of the bribery scheme or the cover-up. The district court opined that "[p]laintiffs' allegations do not provide the particulars for what each Director Defendant knew, how he or she learned of the information, or when he or she learned of the information."[14] Instead, the Arkansas plaintiffs relied on "group-wide conclusory allegations about what the Board must have known based on an imputation of knowledge theory."[15] The court found these allegations insufficient to establish demand futility, noting that courts may not impute knowledge of wrongdoing based on directors' board service, their membership on board committees, or because the corporate governance structure of the company requires that information about misconduct must be brought to the board.[16]

Finding that the Arkansas Complaint lacked specific allegations of knowledge, the district court rejected the theory that the board consciously chose to cover up the bribery scheme. Consequently, the court concluded that the directors did not face a substantial likelihood of personal liability. The court also found that

[14] *Id.* at 13-14.

[15] *Id.* at 14.

[16] *Id.* at 14-15.

15

defendants would not be at risk of liability for the *Caremark* claim or the Section 14(a) claims for similar reasons—namely, that the Arkansas Complaint did not allege with particularity what the defendants were told but instead charged them with constructive notice of red flags. The district court concluded that the Arkansas plaintiffs had failed to adequately allege demand futility.

On April 7, 2015, the district court entered a final judgment dismissing the case with prejudice. Appeal of this decision is pending before the United States Court of Appeals for the Eighth Circuit.

### D. The Delaware Litigation and Procedural Posture

Between April 25, 2012 and June 18, 2012, around the time the Arkansas litigation was getting started, seven derivative actions were filed in this Court. On June 6, 2012, plaintiff Indiana Electrical Workers Pension Trust Fund IBEW sent Wal-Mart a demand for books and records under 8 *Del. C.* § 220. On August 13, 2012, after Wal-Mart produced certain documents, IBEW filed a Section 220 complaint alleging deficiencies in Wal-Mart's document production.[17] On September 5, 2012, the Court of Chancery consolidated the seven then-pending derivative cases, appointed co-lead plaintiffs and co-lead counsel, and ordered

---

[17] Verified Complaint, *Ind. Elec. Workers Pension Trust Fund IBEW v. Wal-Mart Stores, Inc.*, C.A. No. 7779-CS (Del. Ch. Aug. 13, 2012).

plaintiffs to file a consolidated amended complaint after completion of the Section 220 action.[18]

The Section 220 action and related disputes over document production are described in detail elsewhere. To summarize, they involved a trial on the papers, an appeal to the Delaware Supreme Court,[19] and a subsequent motion for contempt.[20] The Section 220 action eventually reached a final resolution on May 7, 2015.[21] In the meantime, on May 1, 2015, about one month after dismissal of the Arkansas Complaint, plaintiffs filed the pending Delaware Complaint. It asserts a single claim for breach of fiduciary duty.

On June 1, 2015, defendants moved to dismiss, arguing that the Arkansas decision collaterally estopped plaintiffs from alleging demand futility, and that even if they were not collaterally estopped, plaintiffs failed to adequately plead demand futility under Court of Chancery Rule 23.1. Defendants also filed a

---

[18] *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, C.A. No. 7455-CS (Del. Ch. Sep. 5, 2012) (ORDER).

[19] *See Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 126 (Del. 2014).

[20] *See Ind. Elec. Workers Pension Trust Fund IBEW v. Wal-Mart Stores, Inc.*, C.A. No. 7779-CB (Del. Ch. May 7, 2015) (TRANSCRIPT).

[21] *Ind. Elec. Workers Pension Trust Fund IBEW v. Wal-Mart Stores, Inc.*, C.A. No. 7779-CB, 2015 WL 2150668 (Del. Ch. May 7, 2015) (ORDER).

17

motion to stay discovery, which I granted on June 24, 2015.[22]  I heard argument on defendants' motion to dismiss on November 12, 2015.  The parties later filed supplemental submissions, with the last filing occurring on February 3, 2016.[23]

## II.    LEGAL ANALYSIS

### A.    Legal Standard

"In considering a motion to dismiss under Chancery Court Rule 23.1 for failure to make a presuit demand, as is true in the case of a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court confines its attention to the face of the complaint."[24]  Strict application of this rule would deprive defendants of the ability to argue for preclusion if, for example, a plaintiff does not plead facts regarding the potentially preclusive litigation or incorporate documents from that litigation into the complaint.  For this reason, "it is axiomatic that a court must still consider the prior adjudication in order to determine whether issue preclusion bars that

---

[22] *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, C.A. No. 7455-CB (Del. Ch. June 24, 2015) (TRANSCRIPT).

[23] The supplemental submissions were prompted by a "demonstrative" plaintiffs handed out at oral argument.  That document included 40 single-spaced pages of text providing significant amounts of detail plaintiffs had not included in their brief concerning 95 documents obtained in the Section 220 litigation.  As a consequence of these new materials and arguments, the parties filed over 50 additional pages of briefing and letters.  The plaintiffs' "handout" was not an appropriate demonstrative but instead was an improper attempt to submit a sur-reply brief.

[24] *White v. Panic*, 793 A.2d 356, 363 (Del. Ch. 2000), *aff'd*, 783 A.2d 543 (Del. 2001).

plaintiff's claims."[25]  Consequently, courts will take judicial notice of the prior adjudication and resulting opinions, but "only to establish the existence of the opinion, and not for the truth of the facts asserted in the opinion."[26]  This is the approach I use in deciding the present motion to dismiss.[27]

In assessing a motion to dismiss a derivative action based on issue preclusion, the Court should look exclusively to the elements of issue preclusion and not to the merits of the underlying issue.[28]  I therefore need to address defendants' demand futility arguments under Court of Chancery Rule 23.1 only if plaintiffs' claim is not barred by issue preclusion.[29]  Because issue preclusion applies and requires dismissal of this case for the reasons explained below, I do not decide the question of demand futility.

---

[25] *M & M Stone Co. v. Pennsylvania*, 388 F. App'x 156, 162 (3d Cir. 2010).

[26] *Id.*; *see also United Access Techs., LLC v. Centurytel Broadband Servs., LLC*, 6 F. Supp. 3d 537, 545 (D. Del. 2013) (rejecting argument that reliance on prior opinion for issue preclusion converted motion into one for summary judgment, because materials were used "only to show that the identical issue was actually and necessarily litigated, and not for the truth of facts averred in those proceedings"), *rev'd and remanded on other grounds*, 778 F.3d 1327 (Fed. Cir. 2015).

[27] *See Yucaipa Am. All. Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at *8 & n.33 (Del. Ch. Oct. 31, 2014) (taking judicial notice of opinions from related litigation in order to assess application of issue preclusion in context of motion to dismiss); *see also* D.R.E. 201-202 (establishing rules for judicial notice).

[28] *See Pyott v. La. Mun. Police Emps.' Ret. Sys.* (*Pyott II*), 74 A.3d 612, 616 (Del. 2013).

[29] *Asbestos Workers Local 42 Pension Fund v. Bammann*, 2015 WL 2455469, at *15 (Del. Ch. May 22, 2015), *aff'd*, 132 A.3d 749 (Del. 2016) (TABLE).

## B. Plaintiffs' Claim Is Barred by Issue Preclusion

Issue preclusion "prevents a party who litigated an issue in one forum from later re-litigating that issue in another forum."[30] Delaware courts will give a judgment from another jurisdiction the same force and effect that the court rendering the judgment would give, whether the rendering court is a state court or a federal court.[31] Under federal common law, a federal court sitting in diversity jurisdiction will apply the preclusion law of the state in which it sits.[32] The issue requiring preclusion analysis here is the Arkansas district court's decision concerning demand futility relating to the Arkansas plaintiffs' fiduciary duty claim, which was brought under the district court's diversity jurisdiction.[33] A federal court would therefore apply the preclusion law of the state of Arkansas. The parties agree on this choice of law.[34]

---

[30] *Yucaipa*, 2014 WL 5509787, at *11.

[31] *Pyott II*, 74 A.3d at 615-16.

[32] *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001).

[33] Arkansas Complaint ¶ 16. The Arkansas Complaint also invoked the district court's supplemental jurisdiction, but the parties do not argue that this alters the analysis. *See Fresh Del Monte Produce Inc. v. Del Monte Foods, Inc.*, 2016 WL 236249, at *3 n.4 (S.D.N.Y. Jan. 20, 2016) ("This Court would, therefore, apply federal rules of preclusion to judgments on claims premised on federal question jurisdiction, and New York rules of preclusion to judgments on claims premised upon diversity or supplemental jurisdiction.").

[34] Tr. Oral Arg. 6, 76. Although plaintiffs argue in their opening brief that federal common law also applies and both standards must be met, the federal common law rule

The judgment of the district court in the Arkansas litigation determined that the Arkansas Plaintiffs had failed to adequately plead demand futility. Defendants argue that this determination collaterally estops plaintiffs from alleging demand futility in this case.

Under Arkansas law, for issue preclusion to apply, (1) the issue sought to be precluded must be the same as the issue in the prior litigation; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment.[35] In addition, the parties to be precluded must have been parties in the prior litigation[36] or been in privity with those parties.[37] Finally, the precluded party must have been adequately represented in the previous litigation.

Plaintiffs do not dispute that the third and fourth elements required to establish issue preclusion under Arkansas law have been satisfied, because the

in diversity cases is to apply the preclusion law of the state in which the court sits, as explained above. *See Semtek*, 531 U.S. at 508-09.

[35] *Riverdale Dev. Co., LLC v. Ruffin Bldg. Sys., Inc.*, 146 S.W.3d 852, 855 (Ark. 2004).

[36] *See Morgan v. Turner*, 368 S.W.3d 888, 895 (Ark. 2010) (citing *Craven v. Fulton Sanitation Serv., Inc.*, 206 S.W.3d 842, 844 (Ark. 2005)).

[37] *Ark. Dep't of Human Servs. v. Dearman*, 842 S.W.2d 449, 452 (Ark. Ct. App. 1992) (en banc).

21

issue of demand futility was determined by a valid and final judgment[38] and the determination of demand futility was essential to that judgment. Thus, there are four issues I must decide to resolve the present motion: (1) whether the issue is the same as the issue in the Arkansas litigation, (2) whether the issue was actually litigated in the Arkansas litigation, (3) whether privity exists, and (4) whether representation was adequate. These issues are addressed in turn.

### 1.    The Issue to Be Precluded Is the Same

Under Arkansas law, an issue to be precluded must be the same as the previously litigated issue. To make such a determination, a court will examine the complaints to determine whether the issue at stake is the same.[39]

In the Arkansas Complaint, plaintiffs allege that making a demand on the Demand Board would be futile because reasonable doubts exist concerning (1) whether the directors' actions were the product of a valid exercise of business judgment, and (2) whether the directors were capable of making an independent

---

[38] In Arkansas, a judgment is generally considered final for issue preclusion purposes even if the judgment has been appealed, as is the case here. *See John Cheeseman Trucking, Inc. v. Pinson*, 855 S.W.2d 941, 943 (Ark. 1993) ("Arkansas follows the majority rule that a judgment is final for purposes of issue preclusion, despite a pending appeal for a review of the judgment, unless the appeal actually consists of a trial *de novo*."). *But see id.* at 944-45 (Gibson, J., concurring) (expressing concerns about using lower court judgments on appeal for collateral estoppel purposes, including risk of inconsistent judgments and danger of irreparable harm to litigants).

[39] *See Harben v. Dillard*, 2010 WL 3893980, at *5 (E.D. Ark. Sept. 30, 2010) (comparing assertions made under claims to be precluded and noting that they were "almost identical" to claims in the other suit).

and disinterested decision about initiating and prosecuting the litigation.[40] The Arkansas Complaint identifies certain alleged actions that were not the product of a valid exercise of business judgment, including the board's decisions to close the bribery investigation after a deficient in-house process and to conceal the wrongdoing until the *New York Times* published the results of its investigation.[41] Regarding the board's ability to make an independent and disinterested decision to pursue litigation, the Arkansas Complaint asserts (1) that nine directors were exposed to substantial liability to stockholders and federal agencies because they knew about the WalMex bribery scheme and the cover-up,[42] (2) that nine directors faced potential liability for violating Section 14(a) of the Exchange Act,[43] and (3) other facts, such as familial ties, calling into question the independence or disinterestedness of specific directors.[44]

In the Delaware Complaint, plaintiffs allege that making a demand on the same Demand Board would be futile because (1) twelve of its members face a

---

[40] Arkansas Complaint ¶¶ 254-55.

[41] *See id.* ¶¶ 256-60. Other alleged decisions of the board that are challenged in the Arkansas Complaint include the decision to violate the FCPA and Mexican law through the bribery scheme, to seek re-election to the board while concealing wrongdoing, and to reward wrongdoers through promotions and compensation. *Id.*

[42] *Id.* ¶¶ 261-68.

[43] *Id.* ¶ 269.

[44] *Id.* ¶¶ 270-81.

substantial likelihood of personal liability stemming from their alleged roles in the WalMex bribery scheme cover-up,[45] (2) eight of its members face a substantial likelihood of personal liability because they consciously failed to monitor and oversee systems and controls to prevent corruption and violations of law at Wal-Mart,[46] (3) six of the directors lack independence from S. Robson Walton, an allegedly interested director,[47] and (4) there is a reasonable doubt as to whether the investigation and cover-up were valid exercises of the board's business judgment.[48] The Delaware Complaint goes on to explore these issues in detail.

Although certain factual details surface in one complaint and not the other,[49] the core demand futility issue in the Arkansas and Delaware Complaints is the same. They both focus on whether the Demand Board is disabled from deciding whether to initiate litigation against defendants for their involvement in the WalMex bribery scheme and cover-up because the Demand Board's actions were

---

[45] Compl. ¶ 212.

[46] Compl. ¶ 213.

[47] Compl. ¶ 214.

[48] Compl. ¶ 272.

[49] For instance, the Delaware Complaint focuses more on allegations that the directors lack disinterestedness because of potential *Caremark* liability for consciously failing to monitor Wal-Mart, while the Arkansas Complaint focuses more on the directors' affirmative involvement in the alleged bribery scheme and cover-up.

24

not the product of valid business judgment and because its members lack independence and disinterestedness.

Plaintiffs assert that the two complaints are not identical on the theory that that the demand futility allegations in the Delaware Complaint are more detailed, specific, and extensive than those in the Arkansas Complaint. Under Arkansas law, however, differences between allegations in the complaints will not prevent issue preclusion from applying if the underlying issue is the same.[50] In other words, the inclusion of additional factual details does not affect whether an underlying *issue* is identical.[51] As this Court explained in a similar case, "whether

---

[50] *See Harben*, 2010 WL 3893980, at \*5 (issue of demand futility found to be identical under Arkansas law where the plaintiff in the action to be precluded had access to more documents, but the "claims for breach of fiduciary duties" and "assertions made under those claims [were] almost identical in the two suits."). Notably, however, the *Harben* court did not consider the precluded claims to be more detailed, despite plaintiff's access to additional documents. *Cf. Hardy v. Hardy*, 380 S.W.3d 354, 358 (Ark. 2011) (addressing claim preclusion rather than issue preclusion) ("Where a case is based on the same events as the subject matter of a previous lawsuit, res judicata will apply even if the subsequent lawsuit raises new legal issues and seeks additional remedies."); *Zinger v. Terrell*, 985 S.W.2d 737, 741 (Ark. 1999) (holding that issue preclusion can bar relitigation of criminal murder conviction in related civil case regarding victim's property). In contrast, Arkansas will not apply issue preclusion when the legal issues in the two cases are different. *See, e.g.*, *Haile v. Johnston*, 482 S.W.3d 323, 329 (Ark. 2016) (Brill, C.J., concurring) (explaining that issue preclusion did not apply because first case addressed whether an open conviction record prevented candidate from holding public office, while second case addressed different issue of whether a conviction record that was sealed under Arkansas statute prevented same candidate from holding office); *Skallerup v. City of Hot Springs*, 309 S.W.3d 196, 200 (Ark. 2009) (declining to apply issue preclusion when first case dealt with annexation and second case dealt with sewer usage rates and debt service charges).

[51] Arkansas courts have not extensively addressed this topic in the context of derivative suits, but other jurisdictions provide guidance. *See Arduini v. Hart*, 774 F.3d 622, 630

the Complaint raises additional facts, or a more compelling characterization of those facts, regarding the same conduct previously at issue" is irrelevant for purposes of issue preclusion.[52] "To hold otherwise would mean that issue preclusion would almost never apply—subsequent plaintiffs could simply add more allegations (or more specific allegations) of corporate malfeasance, and then claim there was no identity of issues."[53]

For these reasons, I reject plaintiffs' assertion that the demand futility issue raised in both complaints is not the same based on the theory that the Delaware Complaint contains additional factual details. To the contrary, because Arkansas law requires only that the issue to be decided is the same, rather than that all facts and arguments are identical, this element of preclusion is satisfied.

---

(9th Cir. 2014) ("[Offering] some additional allegations in support of [plaintiff's] contention that demand is futile does not make this a different issue under Nevada law."); *In re Bed Bath & Beyond Inc. Deriv. Litig.*, 2007 WL 4165389, at *6 (D.N.J. Nov. 19, 2007) (finding that additions to complaint did not prevent issue preclusion because "they still derive from the same gravamen of wrong" and did not negate the identicality of the issues); *Bammann*, 2015 WL 2455469, at *17-18 (applying New York law); *Fuchs Family Trust v. Parker Drilling Co.*, 2015 WL 1036106, at *5 (Del. Ch. Mar. 4, 2015) (applying Texas law while focusing primarily on adequacy of representation); *cf. United States v. Karlen*, 645 F.2d 635, 638 (8th Cir. 1981) (noting that introduction of new facts or claims into second case does not make issue preclusion inappropriate, because issue preclusion merely bars re-litigation of the relevant issue).

[52] *Bammann*, 2015 WL 2455469, at *18 (applying New York Law).

[53] *Arduini*, 774 F.3d at 630.

### 2.    The Issue of Demand Futility Was Actually Litigated

The next element of issue preclusion requires that the issue sought to be precluded was actually litigated in the previous action. The Arkansas Supreme Court has stated that, "[i]n the context of collateral estoppel, 'actually litigated' means that the issue was raised in pleadings, or otherwise, that the defendant had a full and fair opportunity to be heard, and that a decision was rendered on the issue."[54] Whether an issue was "actually litigated" for issue preclusion purposes must be examined on a case-by-case basis.[55]

Plaintiffs argue that certain demand futility issues they raise in Delaware were not properly litigated in the Arkansas action. They contend that deficiencies in the Arkansas Complaint led the district court to apply the *Rales* test when *Aronson* should have applied.[56] Consequently, the district court explicitly declined to consider the second prong of *Aronson*, namely "whether the Board's actions, or conscious inaction, were a valid exercise of business judgment."[57] Plaintiffs argue that, because the Delaware Complaint makes particularized allegations of board

---

[54] *Powell v. Lane*, 289 S.W.3d 440, 445 (Ark. 2008).

[55] *Id.* at 447 (holding that a default judgment was a valid basis for issue preclusion) ("There is no bright-line rule. Each judgment, taken by default, or otherwise, must be examined to determine what was finally decided and whether it meets the requirements of collateral estoppel.").

[56] Pls.' Ans. Br. 22-24.

[57] Arkansas Order at 12.

27

actions that would call for the application of *Aronson*, a key issue of demand futility was not fully litigated in Arkansas.

This argument fails for two reasons. First, even if plaintiffs are correct that the Arkansas Complaint was missing facts that, if alleged, would have caused the district court to apply *Aronson* rather than *Rales*, the question of which test to apply was fully litigated and decided in the Arkansas action. The Arkansas Complaint raised the issue of demand futility, and the Arkansas plaintiffs had the opportunity to be heard on the issue.[58] In particular, before the district court stated that it would not consider the second prong of *Aronson*, it provided a full analysis of which test applied based on the allegations in the Arkansas Complaint and decided that the complaint supported an application of *Rales* rather than *Aronson*.[59] Neither deficiencies in the Arkansas Complaint, nor the addition of new facts or arguments to the complaint in this subsequent action, alter the fact that the issue already has been litigated.

Second, the district court's decision to apply *Rales* instead of *Aronson* had no effect on whether the issue of demand futility was litigated because, in my view, the *Rales* test encompasses all relevant aspects of the *Aronson* test. "As

---

[58] *See Harben*, 2010 WL 3893980, at \*5 (holding that demand futility had actually been litigated because it was raised in pleadings, was argued at a hearing, and court had issued an order deciding whether demand was futile) (citing *Powell*, 289 S.W.3d at 445).

[59] Arkansas Order 9-11.

many members of this Court have recognized, the *Rales* test functionally covers the same ground as the *Aronson* test in determining the impartiality of directors."[60] The district court itself pointed out the overlap between the two tests, suggesting that the choice of test would not have been likely to affect its analysis.[61] Because the *Rales* test "folds the two-pronged *Aronson* test into one broader examination,"[62] it is of no substantive consequence that the district court used *Rales* instead of *Aronson*.

\* \* \* \* \*

For the reasons explained above, the Arkansas Complaint and the Delaware Complaint present the same issue of demand futility, and the issue was actually litigated in Arkansas even though the district court used the *Rales* test. Plaintiffs concede that the demand futility issue was determined by a valid and final

---

[60] *Sandys v. Pincus*, 2016 WL 769999, at \*12-13 & n.59 (Del. Ch. Feb. 29, 2016) (compiling authorities and noting that *Rales* is the "cleaner, more straightforward" test for demand futility).

[61] Arkansas Order at 12 n.7 ("The Court notes that the difference between *Rales* and *Aronson* may blur in cases like this one, because the particularized allegations essential to creating reasonable doubt as to the substantial likelihood of personal liability for breach of fiduciary duties may also implicate the question whether the Board can avail itself of business judgment protections.") (citing *Guttman v. Huang*, 823 A.2d 492, 501 (Del Ch. 2003)).

[62] *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at \*4 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d 802 (Del. 2006) (TABLE); *see also Guttman*, 823 A.2d at 501 (noting that although the "*Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry[,] . . . that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*") (Strine, V.C.).

29

judgment, and that this determination was essential to the judgment. Accordingly, the four elements generally necessary for preclusion to apply under Arkansas law have been established.

### 3. The Privity Requirement Is Satisfied

In addition to the four elements discussed above, Arkansas preclusion law requires that the party to be precluded be the same as, or in privity with, the party in the action having preclusive effect.[63] Applying the privity requirement to derivative actions involving two different stockholder plaintiffs raises the question whether the required privity is between the two stockholders, or between each stockholder and the corporation. Further complicating matters here, Arkansas courts have not yet explicitly addressed this privity question.[64]

---

[63] *See Dearman*, 842 S.W.2d at 452.

[64] A federal court applying Arkansas law has held a subsequent derivative stockholder plaintiff to be collaterally estopped from alleging demand futility based on the preclusive effect of a previous demand futility ruling, but the parties did not raise and the court did not explicitly address the question of privity. *See Harben*, 2010 WL 3893980, at *1. The plaintiff in *Harben* instead attempted to distinguish other derivative cases by arguing that issue preclusion should not apply to the first-filed case if the second-filed case was decided first. *See* Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Opening Supplemental Brief in Support of Defendants' Motion to Dismiss the Complaint, *Harben v. Dillard*, 4:09-CV-00395-BSM, 2010 WL 3229629 (E.D. Ark. Apr. 2, 2010). The federal judge in the Arkansas Wal-Mart litigation similarly opined that issue preclusion would be likely to apply to subsequent suits without explicitly addressing privity. *See In re Wal-Mart Stores, Inc. S'holder Deriv. Litig.*, C.A. No. 4:12-CV-4041, at 3 (W.D. Ark. June 4, 2014) (ORDER) (citing *Harben*, 2010 WL 3893980, at *6). These cases suggest that federal judges applying Arkansas law believe that privity would exist in derivative actions, although it is unclear to what, if any, extent they analyzed the issue.

Courts in Delaware may address unsettled questions of law in another state by examining the present status of the law in that state to determine what rule its courts would be likely to follow.[65] I will therefore examine the status of Arkansas preclusion law to determine whether or not Arkansas courts would conclude that privity exists between derivative stockholder plaintiffs for purposes of issue preclusion. In determining unsettled questions of issue preclusion law, Arkansas courts look to decisions from courts in other jurisdictions,[66] the Restatement of Judgments,[67] and principles of public policy regarding issue preclusion.[68] I consider each category below.

---

[65] *See, e.g.*, *Monsanto Co. v. C.E. Heath Comp. & Liab. Ins. Co.*, 652 A.2d 30, 35 (Del. 1994); *see also Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1200 (Del. 1997) ("It is not unusual for courts to wrestle with open questions of the law of sister states or foreign countries.").

[66] *See, e.g.*, *Dearman,* 842 S.W.2d at 452 (citing Third Circuit, Colorado, New York, and New Jersey opinions in privity analysis).

[67] *See, e.g.*, *Estate of Goston v. Ford Motor Co.*, 898 S.W.2d 471, 473 (Ark. 1995) (using definition of issue preclusion from Restatement (Second) of Judgments § 27 (1982)); *Smith v. Roane*, 683 S.W.2d 935, 936 (Ark. 1985) (following comment to Restatement (Second) of Judgments § 27 regarding issue preclusion); *Dearman*, 842 S.W.2d at 452-55 (referencing Restatement (Second) of Judgments §§ 28, 39, and 62 in analyzing collateral estoppel issues in majority and dissenting opinions); *cf. B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015) (noting that the United States Supreme Court regularly relies on the Restatement for guidance regarding elements of issue preclusion).

[68] *See, e.g.*, *Beaver v. John Q. Hammons Hotels, L.P.*, 138 S.W.3d 664, 670 (Ark. 2003).

### a. Other Jurisdictions

The vast majority of other jurisdictions that have decided the issue have concluded that privity exists between different stockholder plaintiffs who file separate derivative actions.[69] The common theme in the opinions where privity has

---

[69] *See Arduini*, 774 F.3d at 633-34 (holding that derivative plaintiffs are in privity under Nevada law, based on assessment of the holdings of "the majority of courts that have addressed this issue" outside of Nevada, where issue had not been addressed); *In re Sonus Networks, Inc., S'holder Deriv. Litig.*, 499 F.3d 47, 64 (1st Cir. 2007) (holding the same as a matter of Massachusetts law); *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir. 1981) (finding privity for purposes of res judicata in stockholder derivative actions arising under Federal Rule of Civil Procedure 23.1, prior to *Semtek*); *Goldman v. Northrop Corp.*, 603 F.2d 106, 109 (9th Cir. 1979) (finding subsequent action barred under res judicata because real party in both actions was corporation); *Hanson v. Odyssey Healthcare, Inc.*, 2007 WL 5186795, at *5 (N.D. Tex. Sept. 21, 2007) (finding privity under Texas law because "the unique nature of derivative litigation logically leads to a finding of privity between all shareholder plaintiffs"); *LeBoyer v. Greenspan*, 2007 WL 4287646, at *3 (C.D. Cal. June 13, 2007) (finding privity under California law); *In re Bed Bath & Beyond*, 2007 WL 4165389, at *8 (finding privity under New York law when first derivative plaintiff was an adequate representative); *Henik ex rel. LaBranche & Co., Inc. v. LaBranche*, 433 F. Supp. 2d 372, 380 (S.D.N.Y. 2006) (noting that "privity among shareholder plaintiffs in the derivative litigation context presents an atypical situation" that allows issue preclusion because in both actions the corporation is the real party in interest); *Bammann*, 2015 WL 2455469, at *16 (applying New York law and noting that stockholders are effectively interchangeable members of a class because claims belong to corporation); *Fuchs Family Trust*, 2015 WL 1036106, at *5 (finding privity between derivative plaintiffs under Texas law to dismiss a Section 220 action); *In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203, at *10 & n.56 (Del. Ch. Sept. 28, 2007) (appearing to apply Illinois law) ("Because the corporation is the true party in interest in a derivative suit, courts have precluded different derivative plaintiffs in subsequent suits. This commonality lends itself to the application of collateral estoppel or issue preclusion."). *But see Kaplan v. Bennett*, 465 F. Supp. 555, 561-62 (S.D.N.Y. 1979) (holding no issue preclusion regarding demand futility by distinguishing a failure to make demand in first case from a successful argument in second case that demand would be futile, without addressing the fact that plaintiff in first case, *Cramer v. Gen. Tel. & Elecs. Corp.*, 582 F.2d 259, 265 (3d Cir. 1978), had also argued demand futility) ("[The preclusive opinion] affirmed the district court's dismissal of the claim because [first plaintiff] had failed to make a demand upon the board of directors as required by Fed. R.

been found is that the corporation is the real party in interest in both the first derivative action and the subsequent suit.[70] Viewed in this fashion, the first stockholder plaintiff does not represent the second stockholder plaintiff. Instead, both plaintiffs sue on behalf of the corporation and are essentially interchangeable.[71] Based on this logic, most courts addressing the issue have

Civ. P. 23.1. A decision based upon a failure to satisfy a procedural requirement is not to be given preclusive effect. However, in the instant case, the Kaplans did not make a demand on the board of directors, but asserted the futility of such a gesture.") (citations omitted); *La. Mun. Police Emps.' Ret. Sys. v. Pyott* (*Pyott I*), 46 A.3d 313, 334 (Del. Ch. 2012) ("[A]n earlier Rule 23.1 dismissal does not have preclusive effect on a subsequent derivative action brought by a different plaintiff because, as the earlier Rule 23.1 decision itself established, the prior plaintiff lacked authority to sue on behalf of the corporation and therefore was not in privity with the corporation or other stockholders."), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013) (reversing Court of Chancery because California preclusion law applied rather than Delaware law, without opining on issue under Delaware law); *Ex parte Capstone Dev. Corp.*, 779 So. 2d 1216, 1218-19 (Ala. 2000) (declining to apply res judicata based on interpretation of failure to make a demand as a procedural defect).

[70] *See, e.g.*, *Ross v. Bernhard*, 396 U.S. 531, 538 (1970) ("The corporation is a necessary party to the action; without it the case cannot proceed. Although named a defendant, it is the real party in interest, the stockholder being at best the nominal plaintiff."); *Goldman v. Northrop Corp.*, 603 F.2d at 109 ("The parties are the same, although represented by different shareholders. . . . The corporation was the sole real party in interest in both cases."); *Dana v. Morgan*, 232 F. 85, 90-91 (2d Cir. 1916) ("[The stockholder] sues, not primarily in his own rights, but in the right of the corporation. The wrongs of which he complains are wrongs to the corporation. . . . [T]he corporation whose interest he seeks to represent in this suit was a party to [the previous] action and is concluded by it and . . . that concludes him."); *LeBoyer*, 2007 WL 4287646, at *3 ("[I]n both suits the plaintiff is the corporation itself."); *In re Career Educ. Corp.*, 2007 WL 2875203, at *10.

[71] *See* 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1840 (3d ed. 1998) ("Determining the effect to be given a judgment in an action under Rule 23.1 generally does not pose any unusual problems because the shareholder-plaintiff in a stockholder-derivative action is seeking to enforce the right of the corporation and the corporation is present as a defendant.")

33

concluded that the corporation is bound by the results of the first judgment in subsequent litigation, even if the result is to preclude a different stockholder's subsequent derivative claim. These rulings include three federal appellate court decisions and two decisions of this Court.[72]

*Pyott I*, an opinion from this Court, reached a different conclusion under Delaware law. The Court in *Pyott I* reflected upon the dual nature of a derivative suit, noting that it is first a suit by a stockholder plaintiff to compel the corporation to sue, and it is second a suit by the corporation, asserted by stockholders on its behalf, against defendants.[73] The Court reasoned that, at the stage when defendants challenge demand futility, the stockholder does not yet represent the corporation, nor does the suit yet belong to the corporation. Instead, the stockholder is merely asserting a claim for equitable authority to sue on the corporation's behalf.[74] The Court opined that at that stage the corporation is not yet the real party in interest, and consequently privity between subsequent derivative stockholders is not yet established. Defendants point out that *Pyott I* was reversed, but they overlook the fact that the Supreme Court reversed *Pyott I* for applying Delaware law rather than California law, while explicitly stating that

---

[72] *See supra* note 69.

[73] *Pyott I*, 46 A.3d at 328-29 (citing *Aronson*, 473 A.2d at 811 and *Cantor v. Sachs*, 162 A. 73, 76 (Del. Ch. 1932)).

[74] *See id.* at 330.

it did not reach the privity question under Delaware law.[75] This issue thus remains

unresolved in Delaware.

Although *Pyott I* gives thoughtful consideration to important issues regarding privity and the point at which a derivative action should begin to belong to the corporation, I am not persuaded that an Arkansas court would apply *Pyott I*'s reasoning as a matter of Arkansas law given that the clear weight of authority in other jurisdictions falls on the side of finding privity and given that the reasoning of that authority appears to comport with Arkansas law. In particular, though not in the context of privity, the Arkansas Supreme Court has stated that it is "inherent in the nature of the [derivative] suit itself that it is the corporation whose rights are being redressed rather than those of the individual plaintiff. It follows that the corporation is regarded as the real party in interest."[76] My review of Arkansas law also has not revealed any indication that the interest of the corporation in the suit would only be deemed to begin after demand futility is established, as suggested in *Pyott I*. Accordingly, I believe it is likely that the Arkansas Supreme Court would follow the majority rule that privity attaches to subsequent derivative stockholders.

---

[75] *Pyott II*, 74 A.3d at 618 ("Although the Court of Chancery is divided on the privity issue as a matter of Delaware law, we cannot address the merits of that issue in this case.").

[76] *Brandon v. Brandon Constr. Co. Inc.*, 776 S.W.2d 349, 352 (Ark. 1989) (quoting *Morgan v. Robertson*, 609 S.W.2d 662, 663 (Ark. Ct. App. 1980)).

### b. The Restatement of Judgments

Plaintiffs argue that Section 41 of the Restatement (Second) of Judgments (the "Restatement") suggests that there is no privity between different derivative stockholder plaintiffs.[77] That provision lists five categories of persons who can establish privity with a subsequent plaintiff and bind that plaintiff through issue preclusion. According to plaintiffs, only one of those categories is remotely analogous to a derivative plaintiff, namely category (e), which concerns class action representatives. The relevant part of Section 41 states as follows:

> (1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:
>
> * * * * *
>
> (e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.
>
> (2) A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process.
>
> Exceptions to this general rule are stated in § 42.[78]

---

[77] Pls.' Ans. Br. 25-28.

[78] Restatement (Second) of Judgments § 41 (1982). The exceptions in Section 42 regarding adequacy of representation are addressed later in this opinion.

Relying on Section 41's requirement that the class representative must be "designated as such with the approval of the court" or by contract,[79] plaintiffs argue that, by the same logic, a derivative plaintiff should not be able to gain representative authority as required to establish privity merely by filing a complaint. For additional support, plaintiffs note a comment to Section 59 of the Restatement, which states in relevant part:

> The stockholder's or member's derivative action is usually though not invariably in the form of a suit by some of the stockholders or members as representatives of all of them. Whether the judgment in such a representative suit is binding upon all stockholders or members is determined by the rules stated in §§ 41 and 42. If it is binding under those rules, it precludes a subsequent derivative action by stockholders or members who were not individually parties to the original action.[80]

Plaintiffs argue that because derivative actions only preclude subsequent actions if they meet the requirements of Sections 41 and 42, and because Section 41 requires an adjudicative or contractual designation of a representative, dismissals of derivative actions for lack of demand futility are not preclusive upon future derivative plaintiffs. This argument tracks the reasoning of *Pyott I* that a derivative plaintiff should not be able to speak for the corporation until demand futility has been established.

---

[79] *Id.* § 41 cmt. a ("The method of designating the representative may be adjudicative or contractual . . . .").

[80] *Id.* § 59 cmt. c.

37

Although plaintiffs' argument is plausible, the Restatement is ambiguous on the privity question in the derivative context. Another comment in Section 59 casts doubt on the concept of privity as being between the two derivative stockholders. The comment notes that a stockholder derivative action "is one on behalf of the corporation as such,"[81] although it does not specify whether a derivative plaintiff acts on behalf of the corporation from the outset or only after demand futility is established. Reflective of the Restatement's lack of clarity concerning privity in the derivative context, cases citing Section 41(1)(e) have come out in both directions: some have held that privity exists between derivative stockholders even when demand futility has not been established,[82] but others,

---

[81] *Id.* § 59 cmt. e.

[82] *See, e.g.*, *Arduini*, 774 F.3d at 634 n.11 (relying on Section 41's list of representative relationships in establishing privity) ("These examples of representation are analogous to that of shareholder derivative suits, where a shareholder is acting on behalf of the corporation and also other shareholders."); *see also In re MGM Mirage Deriv. Litig.*, 2014 WL 2960449, at *6 (D. Nev. June 30, 2014) (noting that Restatement's list of relationships that establish privity are examples but that the list is non-exhaustive and can include subsequent derivative stockholders); *In re Sonus Networks, Inc. S'holder Deriv. Litig.*, 422 F. Supp. 2d 281, 291 (D. Mass. 2006) (citing Sections 41 and 42 in privity analysis, although without explicitly stating that they support derivative stockholder privity), *aff'd*, 499 F.3d 47 (1st Cir. 2007); *cf. Slocum ex rel. Nathan A v. Joseph B*, 588 N.Y.S.2d 930, 931 (N.Y. App. Div. 1992) (declining in family law case to strictly adhere to list of categories in Section 41) ("We think the better rule, however, and that which is actually applied in this State as well as in a number of other jurisdictions, eschews strict reliance on formal representative relationships in favor of a more flexible consideration of whether all of the facts and circumstances of the party's and nonparty's actual relationship, their mutuality of interests and the manner in which the nonparty's interests were represented in the prior litigation establishes a functional representation such that

including *Pyott I*, reached the opposite conclusion.[83]

In short, the Restatement is inconclusive as a predictor of how an Arkansas court would decide the privity question. One plausible reading suggests that privity would not exist between derivative plaintiffs unless the plaintiff in the first judgment had been authorized in some fashion by a court or the corporation. On the other hand, the Restatement's lack of differentiation between pre-futility and post-futility plaintiffs instead could indicate that all derivative actions are in a category similar to post-certification class actions. The Restatement does not meaningfully analyze whether the corporation's status as the real party in interest makes privity a foregone conclusion for subsequent representative stockholders. Such a reading, however, would comport with the weight of authority discussed above, which finds privity between derivative plaintiffs, regardless of the stage of the proceeding, because the real party in interest is the corporation.

---

the nonparty may be thought to have had a vicarious day in court.") (internal quotation marks omitted).

[83] *See Pyott I*, 46 A.3d at 333; *see also Weinfeld v. Minor*, 2016 WL 951352, at *4 (D. Nev. Mar. 9, 2016) (finding no privity between derivative stockholders for res judicata purposes because none of the categories in Section 41 applied).

### c. Public Policy

In Arkansas, the doctrine of issue preclusion is "based upon the policy of limiting litigation to one fair trial on an issue . . . ."[84] Issue preclusion should apply "only when the party against whom the earlier decision is being asserted had a full and fair opportunity to litigate the issue in question."[85] To the extent a certain application of issue preclusion is anathema to public policy, courts will not apply the rule rigidly.[86] Regarding privity, Arkansas appears to take a practical approach. "The underlying purpose of the modern [privity] rule is fundamental fairness and common sense."[87] Arkansas courts have opined that the practical goal of preventing re-litigation by substantially identical parties trumps the need for precise identicality.[88]

---

[84] *Dearman*, 842 S.W.2d at 451; *accord Beaver*, 138 S.W.3d at 670; *see also Crockett v. C.A.G. Invs., Inc.*, 381 S.W.3d 793, 799 (Ark. 2011) (noting that collateral estoppel applies to a plaintiff or his privies when attempting to re-litigate an issue against a defendant or his privies) ("The true reason for holding an issue to be barred is not necessarily the identity or privity of the parties, but instead to put an end to litigation by preventing a party who has had one fair trial on a matter from relitigating the matter a second time.").

[85] *Dearman*, 842 S.W.2d at 451; s*ee also E. Tex. Motor Freight Lines, Inc. v. Freeman*, 713 S.W.2d 456, 459 (Ark. 1986) ("But we have never extended the concept of collateral estoppel to the point that claimants who have had no trial at all, nor any opportunity to present their claims, are precluded by the outcome of litigation to which they were not privy. We believe justice preserves to everyone the right to his 'day in court.'").

[86] *See United States v. Stauffer Chem. Co.*, 464 U.S. 165, 176 (1984) (White, J., concurring) ("[T]here is no justification for applying collateral estoppel, which is a flexible, judge-made doctrine, in situations where the policy concerns underlying it are

It is useful to compare these policy rationales with the rationales other states have given for applying issue preclusion against derivative plaintiffs. Some jurisdictions have concluded that establishing privity over subsequent derivative stockholders is sound public policy because it prevents the perpetual re-litigation of the demand futility question.[89] On the other hand, courts in other jurisdictions have expressed concern that finding privity may allow fast-filing derivative plaintiffs who do not make an adequate effort to allege demand futility to preclude more diligent plaintiffs who bring subsequent litigation that could have been more successful even though neither the court nor the corporation ever authorized the fast-filing plaintiffs to represent the corporation.[90]

---

absent. . . . Preclusion must be evaluated in light of the policy concerns underlying the doctrine.").

[87] *Dearman*, 842 S.W.2d 449, 452 (quoting *Moore v. Hafeeza*, 515 A.2d 271, 274 (N.J. Super. Ct. Ch. Div. 1986)).

[88] *See Wells v. Ark. Pub. Serv. Comm'n*, 616 S.W.2d 718, 719 (Ark. 1981) (applying res judicata) ("The exact same parties are not required as it is sufficient if there is substantial identity of the parties."); *Rose v. Jacobs*, 329 S.W.2d 170, 172 (Ark. 1959).

[89] *In re Sonus Networks*, 499 F.3d at 64 ("The defendants have already been put to the trouble of litigating the very question at issue, and the policy of repose strongly militates in favor of preclusion."); *Henik*, 433 F. Supp. 2d at 380 ("In addition, as Defendants point out, if [derivative stockholder privity] were not the rule, shareholder plaintiffs could indefinitely relitigate the demand futility question in an unlimited number of state and federal courts, a result the preclusion doctrine specifically is aimed at avoiding."). *But see Pyott I*, 46 A.3d at 335 (noting that original judgment could still serve as persuasive authority to second court and could bind original plaintiff through *stare decisis*).

[90] *Bammann*, 2015 WL 2455469, at *18 n.147 ("A specter of unfairness appears, however, in the derivative context, where a derivative plaintiff with a viable claim may

41

In my view, the policy rationales for finding subsequent derivative plaintiffs to be in privity would resonate with courts in Arkansas in light of the state's policy of using preclusion to ensure issues are litigated only once and its recognition that the corporation is the real party in interest in a derivative action.[91] At the same time, concerns about fast filers precluding future plaintiffs align with the state's policy of ensuring that parties to be precluded have received a full and fair opportunity to be heard. These competing policy interests may be balanced by requiring that a derivative plaintiff be an adequate representative in order for a judgment to have a preclusive effect on subsequent actions.[92] That issue is addressed in the next section.

\* \* \* \* \*

To summarize, the overwhelming majority of decisions in other jurisdictions have found privity between different stockholder plaintiffs in derivative actions on the premise that the corporation is the real party in interest both actions, a premise that the Arkansas Supreme Court has recognized expressly. The Restatement is

---

be estopped from proceeding based on the inadequate efforts of a fellow stockholder in privity, a feckless fast filer.").

[91] *See Dearman*, 842 S.W.2d at 451; *Brandon*, 776 S.W.2d at 352.

[92] Wright & Miller, *supra* note 71, § 1840 ("The justification for binding nonparty stockholders to a judgment in a Rule 23.1 action is that their interests were adequately represented in the litigation. . . . Of course, as is discussed more fully elsewhere, there must be a sufficient showing of procedural fairness and adequate representation to satisfy due process.").

inconclusive, and public policy arguments exist on both sides of the privity question.  Taking all these points into consideration, it is my opinion that Arkansas courts likely would find that the privity requirement is satisfied here because that result accords with the clear weight of authority and resonates with the policy in Arkansas of using preclusion to ensure that issues are litigated only once.

### 4.     The Arkansas Plaintiffs Were Adequate Representatives

The final disputed issue is whether the Arkansas plaintiffs were inadequate representatives such that issue preclusion cannot apply.  Due process under the United States Constitution requires that a judicial procedure "fairly insures the protection of the interests of absent parties who are to be bound by it."[93]  One requirement for such procedures is that the absent parties "are in fact adequately represented by parties who are present."[94]  The Federal Rules of Civil Procedure embrace the principle of due process.  Federal Rule 23.1 states that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders . . . who are similarly situated in enforcing the right of the corporation . . . ."[95]

---

[93] *Hansberry v. Lee*, 311 U.S. 32, 42 (1940).

[94] *Id.* at 42-43.

[95] Fed. R. Civ. P. 23.1.  It bears noting that assessing adequacy of representation under Rule 23.1 (which typically occurs in the context of a motion to dismiss) arises in a different posture than assessing adequacy of representation for purposes of issue preclusion, which arises in a second case after a judgment has been entered in the first.

43

Citing a single pre-*Semtek* district court opinion, plaintiffs argue that federal law applies to the issue because the Arkansas action is governed by Federal Rule 23.1.[96] Plaintiffs acknowledge, however, that "even if Arkansas law applied, the analysis would not differ."[97] This is because Arkansas Rule of Civil Procedure 23.1 is substantively identical to Federal Rule 23.1.[98]

In addressing adequacy of representation, defendants focus on Arkansas law and, because there is little authority in Arkansas regarding the adequacy of representation requirement for issue preclusion, they point to the Restatement to provide an analytical framework. Numerous courts similarly have relied on the Restatement to consider the issue of adequacy of representation for purposes of issue preclusion.[99]

---

Although plaintiffs' authorities tend to fall in the former category, this case falls into the latter. That being said, the requirements for adequate representation may be similar in these postures, if not the same. *Cf.* William B. Rubenstein, *Finality in Class Action Litigation: Lessons from Habeas*, 82 N.Y.U. L. Rev. 790, 810 (2007) (noting in class action context that the requirements of Rule 23 must be at least as stringent as the requirements of the Constitution, but could be even stricter).

[96] Pls.' Ans. Br. 8 (citing *Recchion ex rel. Westinghouse Elec. Corp. v. Kirby*, 637 F. Supp. 284, 289 (W.D. Pa. 1985)).

[97] *Id.* n.21 (citing Ark. R. Civ. P. 23.1).

[98] Ark. R. Civ. P. 23.1 ("The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders . . . similarly situated in enforcing the right of the corporation . . . .").

[99] *See, e.g., Arduini*, 774 F.3d at 635-36 (using Restatement to decide issue under Nevada law) ("[I]ssue preclusion does not apply where the first shareholder did not adequately represent the corporation, minimizing the risk of unfairness to shareholders."); *In re*

Because Arkansas and numerous other courts look to the Restatement to determine unsettled questions of issue preclusion law,[100] and because Constitutional principles of due process are embedded in the pertinent provisions of the Restatement,[101] I will look to the analytical framework provided in the Restatement to evaluate the issue of adequacy of representation.

Section 42 of the Restatement outlines certain scenarios in which a person will not be bound to a prior judgment.[102] Relevant here are two questions bearing on adequacy of representation: whether the interests of the representative and the represented person are aligned, and whether the representation was grossly

*Sonus Networks*, 499 F.3d at 64-66 (using Restatement to decide issue under Massachusetts law) ("[T]o bind the corporation, the shareholder plaintiff must have adequately represented the interests of the corporation."); *Hanson*, 2007 WL 5186795, at *6; *Henik*, 433 F. Supp. 2d at 381 (noting that issue preclusion in derivative case could be challenged in cases where inadequate representation is alleged); *Pyott II*, 74 A.3d at 618 & nn.21 & 25 (noting use of Restatement to determine adequacy and citing *Sonus*' quotation of Restatement in determining adequacy); *South v. Baker*, 62 A.3d 1, 12-13 (Del. Ch. 2012) ("Decisions that give preclusive effect to a Rule 23.1 dismissal universally recognize that another stockholder still can sue if the first plaintiff provided inadequate representation.").

[100] *See supra* note 67.

[101] Restatement § 42 & Reporter's Note (listing representation requirements to bind a represented party and noting that "[t]he provisions of this section are thus closely related to, if indeed they are not particularized expressions of, the requirements of due process").

[102] *Id.*

deficient.[103]   Keeping in mind that Wal-Mart is the real party in interest and thus the party that must be adequately represented, I address these questions in turn.

### a.    The Arkansas Plaintiffs' Interests Were Not Misaligned

Adequate representation for preclusion purposes requires that the interests of the party to be precluded and the representative be aligned.[104]   The Restatement does not explicitly address conflicts of interest in derivative suits, but it notes that a judgment against one class member will not bind another if a substantial divergence in their interests prevented the first class member from representing the other adequately.[105]   Similarly, derivative cases in other jurisdictions have noted that an adequate representative stockholder must "be free from economic interests that are antagonistic to the interests of the class."[106]

---

[103] *Id.* § 42(d)-(e).   Plaintiffs do not argue that one of the Restatement's other major grounds for inadequacy, collusion between the representative plaintiff and the defendant, exists here.  *See id.* cmt. f.

[104] *See Taylor v. Sturgell*, 553 U.S. 880, 900-01 (2008).

[105] Restatement § 42(1)(d) ("With respect to the representative of a class, there was such a substantial divergence of interest between him and the members of the class, or a group within the class, that he could not fairly represent them with respect to the matters as to which the judgment is subsequently invoked[.]").   A comment goes on to state that "a judgment is not binding on the represented person . . . where, to the knowledge of the opposing party, the representative seeks to further his own interest at the expense of the represented person."  *Id.* cmt. f.

[106] *See Arduini*, 774 F.3d at 635.

Plaintiffs argue that, by seeking to control the case in order to earn attorneys' fees, Arkansas counsel put their personal economic interests ahead of the interests of Wal-Mart and its stockholders, who instead would have benefited from litigating demand futility with the strongest complaint possible. To support this argument, plaintiffs' lead counsel submitted an affidavit in which he contends that Arkansas counsel recognized that Section 220 documents would help establish demand futility but refused to discontinue the Arkansas litigation in favor of the Delaware litigation unless they were offered a substantial share of any Delaware fee award.[107]  Plaintiffs allege no other conflict of interest between the Arkansas plaintiffs and Wal-Mart.

In my view, plaintiffs misapprehend the types of conflict that will make a derivative plaintiff an inadequate representative. Representatives have been found inadequate when their interests are directly opposed to the interests of the person being represented, which in this case is Wal-Mart.[108]  In contrast, plaintiffs here

---

[107] Affidavit of Stuart M. Grant, ¶ 13, June 30, 2015. Counsel for the Arkansas plaintiffs submitted an affidavit vigorously denying these assertions and providing a very different account of the strategy pursued in the Arkansas action. *See* Affidavit of Judith S. Scolnick ("Scolnick Aff."), ¶¶ 22, 25-26, July 16, 2015. Whether I may consider the contents of these affidavits in deciding the pending motion to dismiss is unclear but ultimately of no moment since they are not necessary to my analysis.

[108] *See, e.g.*, *Hansberry*, 311 U.S. at 44-46 (holding that plaintiffs in first action did not adequately represent defendants in second action where first plaintiffs appeared to seek enforcement of a racially restrictive covenant and defendants in second action sought to resist it); *Hoxworth v. Blinder*, 74 F.3d 205, 208 (10th Cir. 1996) (holding no privity for res judicata purposes because "the class was an adversary to the trustee," rendering

47

contend only that counsel for the Arkansas plaintiffs had a personal financial interest in maintaining the litigation in a particular forum—a reality that counsel for any set of plaintiffs involved in multi-jurisdictional litigation would face. They do not allege that the Arkansas plaintiffs had an interest adverse to Wal-Mart or that they would benefit from bringing harm upon the company. To the contrary, it appears that the Arkansas plaintiffs, as stockholders of Wal-Mart, would benefit from any recovery Wal-Mart received through a judgment or settlement in their derivative action. In my view, their counsel's preference to litigate in a certain jurisdiction and to maintain control of the case does not create a misalignment of interests between the Arkansas plaintiffs and Wal-Mart sufficient to impugn their adequacy as Wal-Mart's representatives, especially when their interests otherwise appear to be closely aligned.

### b. The Arkansas Plaintiffs Were Not Grossly Deficient Representatives

The second aspect of inadequacy relevant here involves deficient or incompetent representation. Under the Restatement, issue preclusion will not apply if "[t]he representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts

---

trustee an inadequate representative) ("As a judgment creditor of Meyer Blinder, the Hoxworth Class was in direct opposition with the trustee. Every dollar of Meyer Blinder's assets the Hoxworth Class reached by imposition of its secured lien would leave one dollar less in the Blinder Robinson estate for the trustee to satisfy creditors.").

48

making that failure apparent."[109]  A comment goes on to distinguish between imperfect legal strategies, which would not warrant a finding of inadequacy, and "grossly deficient" management of the litigation that would be apparent to the opposing party so as to undermine that party's reliance on the prior adjudication:

> ***The failure of a representative to invoke all possible legal theories or to develop all possible resources of proof does not make his representation legally ineffective***, any more than such circumstances overcome the binding effect of a judgment on a party himself. . . . Where the representative's management of the litigation is so ***grossly deficient as to be apparent to the opposing party***, it likewise creates no justifiable reliance interest in the adjudication on the part of the opposing party. ***Tactical mistakes or negligence on the part of the representative are not as such sufficient*** to render the judgment vulnerable.[110]

Plaintiffs argue, in essence, that the Arkansas plaintiffs were grossly deficient because they failed to pursue books and records from Wal-Mart before pursuing their case.[111]  They point out that their counsel failed to heed the warnings

---

[109] Restatement § 42(1)(e).

[110] Restatement § 42 cmt. f (emphasis added).  Courts have applied the Restatement and its commentary when determining whether representation was deficient in derivative actions.  *See, e.g.*, *Arduini*, 774 F.3d at 635-36 (applying issue preclusion because plaintiffs "adequately litigated their case" even though they did not succeed in alleging demand futility or amend their complaint); *In re Sonus Networks*, 499 F.3d at 65-66 (applying issue preclusion because differences in the two derivative complaints did not support a finding of grossly deficient representation); *cf. In re Bed Bath & Beyond*, 2007 WL 4165389, at *8 n.7 (focusing test on adequacy of representative's counsel rather than representative and concluding that differences between the complaints did not demonstrate counsel was "grossly deficient" or an inadequate representative).

[111] Plaintiffs also argue that "there is no evidence that the **actual** Arkansas plaintiffs had any input in, or knowledge of," the decision to press on with the litigation rather than

of then-Chancellor Strine, who admonished plaintiffs' counsel in Delaware not to proceed on a complaint allegedly similar to the Arkansas Complaint without first pursuing books and records to bolster their allegations.[112] They further note that even the defendants criticized the Arkansas plaintiffs' strategy when seeking to stay the Arkansas action.

Taken to its logical extreme, plaintiffs' argument would mean that any stockholder representative in a derivative action who did not first pursue books and records would be inadequate, or at least presumptively inadequate. In *Pyott II*, however, the Delaware Supreme Court rejected a "fast filer" rule that deems plaintiffs presumptively inadequate if they fail to pursue books and records before litigating derivative claims.[113] Arkansas law controls here, but I have no reason to

---

pursue books and records, and they submit affidavits from three stockholders who testify that they were not actively informed about the litigation. Pls.' Ans. Br. 9-10. The authorities that plaintiffs rely on, however, involve determining adequacy to serve as a class or derivative representative under Rule 23 or 23.1, and not for purposes of issue preclusion after the fact. *See Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, at *1-2 (N.D. Cal. Apr. 25, 2007); *Rothenberg v. Sec. Mgmt. Co., Inc.*, 667 F.2d 958, 962 (11th Cir. 1982). The gravamen of plaintiffs' inadequacy argument for issue preclusion purposes ultimately boils down to the decision of Arkansas counsel not to seek books and records from Wal-Mart as part of their litigation strategy. As discussed below, I conclude that this decision does not demonstrate that the Arkansas plaintiffs were grossly deficient.

[112] Oral Argument, *Klein v. Walton*, C.A. No. 7455-CS, at 9-12, 19-21 (Del. Ch. July 16, 2012) (TRANSCRIPT). Then-Chancellor Strine gave this warning before the Delaware Supreme Court decided in *Pyott II* that there was no presumption of inadequacy for fast-filing plaintiffs. *See infra* note 113.

[113] *See Pyott II*, 74 A.3d at 618 (rejecting irrebutable presumption of inadequacy for derivative stockholders who file before undertaking a Section 220 action, and also noting

think that Arkansas would reach a different conclusion than *Pyott II* on this issue.[114] Of course, even absent a presumption of "fast filer" inadequacy, the failure to pursue a Section 220 action could serve as meaningful evidence of inadequate representation in some cases.[115] But it does not follow that plaintiffs are necessarily inadequate representatives because their counsel chose not to follow a recommended strategy in a different action, even one suggested by a preeminent corporate jurist, particularly when they are litigating in a different jurisdiction before a different judiciary.

Here, the Arkansas plaintiffs have been represented by more than a dozen attorneys from several different law firms.[116] No contention is made that they are not experienced counsel, and the record reflects they have litigated the Arkansas

---

that without such a presumption, "there was no basis on which to conclude that the [first] plaintiffs were inadequate").

[114] In dismissing the Arkansas Complaint, the district court did not find that the Arkansas plaintiffs were inadequate representatives under Rule 23.1, or even raise the issue of adequate representation in its order, notwithstanding the Arkansas plaintiffs' decision not to pursue a books and records action. *See generally* Arkansas Order. The requirement of adequate representation under Rule 23.1 may share similarities with the requirement of adequate representation for issue preclusion. *See supra* note 95.

[115] *Cf. Bammann*, 2015 WL 2455469, at \*18 n.147 ("*Pyott* [*II*] makes clear that a presumption of inadequacy does not arise upon a showing that the prior plaintiff failed to use a section 220 request to develop its case; how a demonstration of inadequacy may be made in the Rule 23.1 context, and the complex issues of comity, efficiency and fairness which would arise therewith, must be addressed through litigation where the issue is fairly presented.").

[116] *See* Arkansas Complaint at 73-75.

action with apparent vigor, including by seeking an appeal of the district court's dismissal of the case, which is pending before the Eighth Circuit.

Turning to the substance of the Arkansas plaintiffs' strategic decision, perhaps it would have been advantageous for the Arkansas plaintiffs to seek additional factual support through a books-and-records action. But, as their counsel attests, crucial excerpts from a number of key documents underlying the *New York Times* article were available on the article's webpage. In her view, these underlying documents "provided sufficient particularized allegations to surmount the demand futility hurdle."[117] Several of the documents from the article's webpage were featured in both complaints, including one of the most crucial excerpts from Wal-Mart's internal reports—the statement that "there is reasonable suspicion to believe that Mexican and USA laws may have been violated." Plaintiffs found that statement important enough to quote it nine times in the

---

[117] Scolnick Aff. ¶ 8. Plaintiffs have sought to strike this affidavit from the record, but I use it only to provide context. It can be independently verified from the internet and the Arkansas Complaint that the excerpts the Arkansas plaintiffs used in their complaint were available from the *New York Times* website. *See* Arkansas Complaint Exs. A-I (internal Wal-Mart document excerpts attached to Arkansas Complaint); Barstow, *supra* note 3 (providing links to excerpts of documents). A web archive search indicates that the relevant document excerpts available now were also available when the article was first published. *See* Internet Archive Wayback Machine, https://web.archive.org/web/20120422013641/http://www.nytimes.com/2012/04/22/business/at-wal-mart-in-mexico-a-bribe-inquiry-silenced.html?_r=1 (preserving webpage as of April 22, 2012). Counsel for Arkansas plaintiffs also stated the same views on the *New York Times* documents at the hearing on the motion to stay the Arkansas action. *See* Leavengood Aff. Ex. 29, Transcript of Hearing on Motion to Stay at 47, 64, *In re Wal-Mart Stores, Inc. S'holder Deriv. Litig.*, 4:12-CV-4041-SOH (W.D. Ark. Sept. 6, 2012).

52

Delaware Complaint and to feature it in their supplemental briefing as well.[118]

This key phrase was included in the excerpts on the *New York Times* website and

was relied upon extensively in the Arkansas Complaint.[119]

It is certainly better practice for stockholder plaintiffs to use "the tools at

hand" to investigate their claims thoroughly before launching derivative suits,[120]

and I share the concerns Delaware courts have expressed regarding the risk of

diligent derivative plaintiffs being collaterally estopped by fast filers. Indeed, it

may turn out (depending on the outcome of the appeal to the Eighth Circuit) that

the Arkansas plaintiffs' assessment of their ability to establish demand futility

---

[118] Compl. ¶¶ 6, 136, 158, 277, 279, 295, 332, 336, 339; Pls.' Resp. to Defs.' Supplemental Br. 7. Other important passages supporting the complaints also were available on the *New York Times* website and used by Arkansas plaintiffs. *See, e.g.*, Compl. ¶¶ 7, 172, 278, 334, 344; Arkansas Complaint ¶ 191 (quote from internal e-mail opining that WalMex's investigation was "truly lacking"); Compl. ¶¶ 7, 148, 358; Arkansas Complaint ¶ 170 (statement by Munich questioning the wisdom of entrusting investigation to WalMex).

[119] Arkansas Complaint ¶¶ 2, 9, 152, 275.

[120] *See Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 120 (Del. 2006) ("The rise in books and records litigation is directly attributable to this Court's encouragement of stockholders, who can show a proper purpose, to use the 'tools at hand' to obtain the necessary information before filing a derivative action. Section 220 is now recognized as 'an important part of the corporate governance landscape.'"); *White v. Panic*, 783 A.2d 543, 557 (Del. 2001) ("[T]his case demonstrates the salutary effects of a rule encouraging plaintiffs to conduct a thorough investigation, using the 'tools at hand' including the use of actions under 8 *Del. C.* § 220 for books and records, before filing a complaint."); *Stone v. Ritter*, 2006 WL 302558, at *1 (Del. Ch. Jan. 26, 2006) ("On numerous previous occasions, this Court and the Delaware Supreme Court have urged would-be derivative plaintiffs to use the so-called 'tools at hand' before filing complaints."), *aff'd*, 911 A.2d 362 (Del. 2006).

without pursuing books and records from Wal-Mart was ill-advised. But, in my opinion, that decision falls into the category of an imperfect legal strategy and does not rise to the level of litigation management that was so grossly deficient as to render them inadequate representatives.

The only remaining question involves the contents of the books and records that plaintiffs here eventually secured through their Section 220 litigation. At oral argument and in supplemental submissions, the parties vigorously disputed the extent to which certain documents the Delaware plaintiffs obtained in the Section 220 action might help to establish demand futility. That dispute is relevant to the issue of demand futility itself, but what is its relevance to the issue of inadequate representation? In other cases, after finding that the outcome of a first-filed derivative action should be given preclusive effect, courts have gone on to compare the allegations in the two derivative complaints, seemingly to provide reassurance that no harm was done in precluding the second action because it would not have passed muster under Rule 23.1 even with the benefit of the corporate records.[121]

---

[121] *See In re Sonus Networks*, 499 F.3d at 71 ("In sum, we cannot conclude that the allegations in the Second Amended Complaint add material allegations that would pass the test for pleading demand futility under Delaware law. It follows that the state plaintiffs were not grossly deficient in failing to include such allegations in the state complaint."); *In re Career Educ. Corp.*, 2007 WL 2875203, at *10 n.58 (noting that issue preclusion would not reduce the efficacy of Section 220 in that case because "even though the [first plaintiffs] did not pursue a Section 220 demand, the [first] Complaint contained all of the key factual allegations that Plaintiffs rely on in this action").

54

I have reservations about this approach because it encourages hindsight review of conduct that should be judged based on the circumstances as they exist in real time.[122] In my view, whether a representative litigated with sufficient diligence necessarily depends on her knowledge and expectations at the time, rather than on what happened later. Taking a real-time approach to evaluating adequacy could mean, hypothetically, that a grossly deficient or conflicted decision not to pursue books and records would render a representative inadequate even when a subsequent Section 220 action unearthed no meaningful new information. Alternatively, it could mean that a good faith decision not to pursue books and records would not demonstrate inadequacy even if a later Section 220 action found

---

[122] My review of relevant case law suggests that this concern—whether the substance of documents obtained in a Section 220 action that are used in a second derivative action should be considered in determining adequacy of representation in a first derivative action for purposes of issue preclusion—has not been discussed in depth. For literature that may shed light on somewhat related concerns, see Kevin R. Bernier, Note, *The Inadequacy of the Broad Collateral Attack:* Stephenson v. Dow Chemical Company *and Its Effect on Class Action Settlements*, 84 B.U. L. Rev. 1023, 1041 (2004) (criticizing an opinion that found inadequate representation based on certain class members' *ex post* dissatisfaction with outcome of a settlement); *see also* Rubenstein, *supra* note 95, at 813 (noting that the second court "might be tempted to ask . . . knowing what we know now [as opposed to at the moment of settlement], was the class adequately represented? . . . [The second court] is not truly revisiting the wisdom of [the first court's] adequacy determination. It is remaking that decision in light of subsequent developments and/or changed circumstances."). *But see* David A. Dana, *Adequacy of Representation After* Stephenson*: A Rawlsian/Behavioral Economics Approach to Class Action Settlements*, 55 Emory L.J. 279, 281 (2006) (suggesting that the adequacy of representation analysis in class action cases should have some relation to *ex post* substantive outcomes because "[a]dequacy or inadequacy of representation, as a practical matter, sometimes unfolds only over time").

a "smoking gun." But if I were to evaluate adequacy of representation using materials uncovered later, I would be at risk of second-guessing the Arkansas plaintiffs' decision-making based on information that was unavailable to them at the time, and of addressing the merits of demand futility even though principles of comity logically would restrict me to assessing issue preclusion only.

For these reasons, I decline to specifically address the documents that plaintiffs obtained in their Section 220 action in assessing whether they were adequately represented by the Arkansas plaintiffs. I will say only this much: defendants have made legitimate arguments that the Section 220 materials, including some of the best documents (as identified by plaintiffs) supporting the allegations of demand futility, would not have affected the outcome of the demand futility analysis.[123] In particular, defendants have proffered plausible interpretations of these documents suggesting that members of management or directors who may have read them would not necessarily have been put on notice of the bribery scheme. I will not address these arguments further for the reasons explained above.

---

[123] *See* Tr. Oral Arg. 102, 109-11, 135-36 (plaintiffs identifying Fung memo, Rodriguezmacedo report, and Halter report as being among their best documents, while cautioning that the Section 220 documents should be viewed in their totality because no single document represents a "smoking gun"); Defs.' Supplemental Br. 4-7 (Dec. 4, 2015) (noting that two of these reports were used in *New York Times* article and among the excerpted materials upon which Arkansas Complaint relied; and that the third memo is exculpatory and renders the two complaints substantively indistinguishable).

* * * * *

In sum, for the reasons explained above, all four elements required under Arkansas law for issue preclusion have been established, and an Arkansas court likely would conclude, consistent with the clear weight of authority from other jurisdictions, that issue preclusion would apply to different stockholder plaintiffs in the context of a derivative suit. The Arkansas plaintiffs were not inadequate representatives of Wal-Mart, whether due to a conflict of interest, gross deficiencies in their representation, or otherwise. Accordingly, the Arkansas district court's holding that demand was not futile precludes re-litigation of the issue in this case.[124]

---

[124] Plaintiffs make two other arguments against issue preclusion that do not warrant in-depth discussion. First, they argue that issue preclusion cannot apply as a matter of federal common law because there is no "pre-existing substantive legal relationship" between the Arkansas plaintiffs and plaintiffs here. Pls.' Ans. Br. 14-15 (quoting *Taylor v. Sturgell*, 553 U.S. at 894). This argument is unavailing because the relevant substantive legal relationship is between Wal-Mart and the Arkansas plaintiffs, not between plaintiffs and the Arkansas plaintiffs, and because I have concluded that Wal-Mart was adequately represented by the Arkansas plaintiffs.

Second, plaintiffs argue that this case falls into one of two special exceptions to issue preclusion outlined in Section 28 of the Restatement. Pls.' Ans. Br. 28-30. The first exception is that re-litigation can be warranted "by differences in the quality or extensiveness of the procedures followed in the two courts." Restatement § 28(3). This exception generally addresses differences in the courts' competencies, such as using a finding from a summary proceeding in a small claims court to preclude an issue in a larger case. *Id.* cmt. d. Plaintiffs argue that the use of Section 220 differentiates the proceedings in this case. The use of Section 220 is not a difference in the quality of the two courts' procedures, but a difference in the parties' litigation decisions. Thus, the first exception is inapplicable.

## III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED.

**IT IS SO ORDERED**.

---

The second exception arises from a "clear and convincing need for a new determination" based on a risk to the public interest, adversarial conduct, or other special reasons. *Id.* § 28(5). Plaintiffs argue that, as a policy matter, issue preclusion should not apply in cases such as this in order to ensure the usefulness of Section 220. A desire for Section 220 to be effective, however, is not the sort of urgent public need that justifies an exception to issue preclusion. Plaintiffs also argue that issue preclusion should not apply because defendants' litigation conduct in the Section 220 case delayed plaintiffs' prosecution of the Delaware action. This argument fails because Wal-Mart is the real party in interest being precluded, not the individual plaintiffs, and a full and fair opportunity to litigate Wal-Mart's interests was provided in Arkansas.